IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

v.                                         CRIMINAL ACTION NO. 2:07cr4
CHRISTINE WHITE,
                    Defendant.

## REPORT AND RECOMMENDATION/OPINION

On the 19th day of April, 2007, came the defendant, Christine White, in person and by her

attorney, Brian J. Kornbrath, and also came the United States by its Assistant United States Attorney,

Stephen Warner, for hearing on Defendant's "Motion to Suppress Evidence" filed on March 23,

2007 [Docket Entry 16] and "Motion to Suppress Evidence Pursuant to Franks v. Delaware" filed

on March 29, 2007 [Docket Entry 19]. The United States filed a "Response to Defendant's Motion

to Suppress Evidence Pursuant to Franks v. Delaware" on April 10, 2007 [Docket Entry 20].

## I. Procedural History

Defendant was indicted by a grand jury attending the United States District Court for the

Northern District of West Virginia on February 21, 2007. The indictment charges the defendant

with maintaining a drug involved premises in violation of Title 21 U.S.C. § 856(a)(1) (Count One);

distribution of crack cocaine in violation of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1) (C) (Count

Two) ; and possession with intent to distribute crack, coke, meth and marijuana in violation of Title

21 U.S.C. §§ 841(a)(1) , 841(b)(1)(C), and 841(b)(1)(A) (Count Three) [Docket Entry 1]. The

Indictment also contains a Forfeiture Allegation.

Defendant was arraigned on March 13, 2007, at which time an initial scheduling order was

entered, scheduling an April 10, 2007, hearing on all motions filed by the defendant and/or the

government which were referred to the undersigned United States Magistrate Judge [Docket Entry

13]. The hearing date was later continued to April 19, 2007, by request of the Assistant United States Attorney [Docket Entry 18].

Pursuant to the initial scheduling order, defendant filed her "Motion to Suppress Evidence" [Docket Entry 16] and "Motion to Suppress Evidence Pursuant to Franks v. Delaware" [Docket Entry 19]. The United States filed its "Response to Defendant's Motion to Suppress Evidence Pursuant to Franks v. Delaware" on April 10, 2007 [Docket Entry 20]. On March 15, 2007, United States District Judge Robert E. Maxwell entered an order referring the aforementioned motions to the undersigned Magistrate Judge for determination [Docket Entry 15].

Thereafter, the Court proceeded to receive evidence and argument relative to Defendant's Motions to Suppress and the United States' Response thereto.

## II. Contentions of the Parties

Defendant contends:

1. The search warrant application failed to establish probable cause to search Defendant's residence;

2. The good faith exception to the exclusionary rule does not apply as the affidavit in support of the search warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

3. The West Virginia State Police report contradicts information contained in the search warrant application, indicating that false statements (which may include material omissions) were knowingly and intentionally, or with reckless disregard for the truth, included in the affidavit in support of the application for the search warrant.

The United States' entire written Response to Defendant's motions is as follows:

Comes now the United States of America and Sharon L. Potter, United States

Attorney for the Northern District of West Virginia, by Stephen D. Warner, Assistant United States Attorney, and responds to the Defendant's Motion to suppress Evidence pursuant to *Franks v. Delaware* and states that the government objects. The case agent, Tpr. Chris Blevins with the West Virginia State Police, will be present and will testify at the April 19, 1007, motion hearing.

### III. Statement of Facts.

Prior to November 28, 2006 two unidentified[1] people that Trooper Blevins testified he knew and trusted told him that there was a large amount of traffic coming and going from Christine White's residence. They asked him to check into it as they suspected drug dealing. No other information concerning these two people or the basis for their reliability is provided by Trooper Blevins to the Court or to State Magistrate Good at the time the search warrant was issued.[2] Trooper Blevins had no knowledge of any ongoing investigation of Christine White with respect to any criminal activity.

As of November 28, 2006, Defendant, Christine White, was a lawful resident of her home located at 2440 U.S. Route 34 West in Elkins, West Virginia.

Trooper Blevins secured an unmarked police car and traveled to White's residence to set up surveillance. He conducted surveillance of the home for approximately 45 minutes noting 7 or 8 cars coming and going. Trooper Blevins followed the last car and pulled it over when the driver negotiated a turn without giving the proper signal.

During the traffic stop of the car driven by Lindsey J. Studer, Trooper Blevins questioned Studer about whether he had any contraband on him. Studer denied possession of any contraband. Incident to the traffic stop and citation, Trooper Blevins conducted a pat down search of Studer and

---

[1] Trooper Blevins refused to identify the two people who supplied him information because he did not want to expose their identities in a hearing with Defendant or Defendant's counsel present.

[2] Trooper Blevins did not even mention these two people in his affidavit.

located two tubes and foil the officer associated with smoking of crank.[3]  Trooper Blevins took

Studer to the state police station and questioned him obtaining information he later reduced to a

written report.

After questioning Studer and before preparing the report, Trooper Blevins, on November 28,

2006, applied for a search warrant from Randolph County Magistrate Michelle Good.  The

application for the search warrant states that the affiant, Trooper Blevins, had cause to believe and

did believe that evidence of a crime, namely, possession with intent to deliver controlled substances,

was concealed in Ms. White's home.  The facts for Trooper Blevins' belief were stated as follows:

> ON THIS DATE, THIS OFFICER WAS CONDUCTING SURVEILLANCE ON A
> RESIDENCE IN WHICH THE RESIDENT, CHRISTINE WHITE, IS A SUS-
> PECTED DRUG DEALER.  THE U/S OBSERVED LARGE AMOUNTS OF
> TRAFFIC IN AND OUT OF THE RESIDENCE OVER APPROX 45 MINUTE
> TIME FRAME.  THIS OFFICER LATER INITIATED A TRAFFIC STOP ON A
> VEHICLE WHICH VISITED THE RESIDENCE FOR DEFECTIVE EQUIP.
> DRUG CONTRABAND WAS FOUND ON THE DRIVER, IE: PIPES, FOIL, ETC.
> THE SUBJECT CONFESSED TO SMOKING "CRANK" EARLIER IN THE DAY.
> WHEN QUESTIONED ABOUT THE RESIDENCE, HE CLAIMED THAT HE DID
> NOT BUY DRUGS . . . FROM THE RESIDENCE ON THIS DATE BUT
> CONFESSED HIS FRIEND DID BUY CRACK FROM THE RESIDENCE TWO
> DAYS AGO AND STATED HE DID OBSERVED [SIC] THE CRACK.  THE
> DRIVER STATED HE ALSO OBSERVED 4 OR 5 LORACETS SETTING ON
> THE LIVING ROOM TABLE OF THE RESIDENCE.

There is no indication that any other evidence was presented to Magistrate Good.  Magistrate

Good signed the search warrant.  That same date, law enforcement officers executed the search

warrant at Defendant's residence, seizing various controlled substances and a large amount of U.S.

currency.  Subsequently, Defendant made statements to the police.

-------

[3]Studer was not cited or charged with a drug crime or traffic violation.  In addition, no
drugs were found on Studer, an admitted drug user, who had just left a "suspected drug dealer's"
house.

## IV. Discussion

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Amendment IV, Constitution of the United States of America.

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

It is axiomatic from the language of the Fourth Amendment warrants clause that the issuing judicial officer takes the affirmation presented in good faith. Therefore, it must be assumed that where a factual showing sufficient to establish probable cause is required for the issuance of the search warrant, such factual showing must be truthful. Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L.Ed.2d 667 (1978) citing from the unpublished opinion in United States v. Halsey, 257 F.Supp. 1002, 1005 (S.D.N.Y. 1966).

### A. Bare Bones Challenge / Probable Cause

Defendant challenges the probable cause determination by the Randolph County magistrate which resulted in the issuance of the search warrant for Defendant's home.

In a review of the probable cause determination made by the judicial officer, the decision of the issuing judicial officer is to be accorded "great deference." "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990) and United States v. Wilhhelm, 80 F.3d 116, 118-119 (4th Cir. 1996). It is not the duty of the reviewing court to conduct a *de novo* determination of probable cause. Instead, it's duty is to determine whether there is substantial evidence in the record supporting the judicial officer's probable cause determination. Massachusetts v. Upton, 466 U.S. 727, 728 (1984).

In the instant case Magistrate Good had the affidavit of State Trooper Blevins. There is no evidence that Magistrate Good had anything more than the affidavit. There is no evidence that Trooper Blevins gave any sworn, unrecorded statements or sworn recorded statements to Magistrate Good. United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994). It is therefore incumbent upon this court as the reviewing court to apply the "totality of circumstances" test to determine whether that which was presented to Magistrate Good by the four corners of the Blevins affidavit supported her issuance of the search warrant. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

There are two factors which are key to the analysis under the totality of circumstances test. They are: (1) the informant's veracity or reliability and (2) his or her basis of knowledge. Id. at 233, 103 S.Ct. at 2329. While reviewing courts are to pay great deference to the issuing judicial officer's findings of probable cause, that does not mean that warrants which are based on conclusory allegations need be upheld. Instead, "sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of another." Id. at 236 and 239, 103 S.Ct. at 2331 and 2332. The extent to which the

report of an informant is corroborated is an important consideration in the evaluation process as to whether that informant's report establishes probable cause. United States v. Wilhelm, supra at 251.

Truthfulness, in the sense of the Fourth Amendment, does not mean every fact recited in the warrant affidavit, is necessarily correct. "Probable cause may be founded upon hearsay and upon information received from informants, as well as upon information with affiant's own knowledge that sometimes must be garnered hastily." Franks v. Delaware, supra at p. 165. However, the hearsay information must have sufficient indicia of reliability. United States v. Ventresca, 380 U.S. 102, 103 (1965) and United States v. Chavez, 902 F.2d 259, 265 (4th Cir. 1990).

The Blevins affidavit is full of conclusions and unreliable hearsay. There is no question that Blevins conducted surveillance of the White residence on November 28, 2006. His stated reason for conducting surveillance is his statement in the affidavit that "the resident, Chistine White is a suspected drug dealer." He testified at the Franks hearing that he initiated the surveillance of White's residence at the suggestion of two people he knew who told him they had observed a lot of traffic to and from White's residence. Trooper Blevins did not disclose the identity of the two people to the State Magistrate. He did not include in his affidavit any factual basis why the two people were reliable. Nor did he provide the State Magistrate with any factual support for his conclusion that White was a "suspected drug dealer." There is no indication in Trooper Blevins' Franks hearing testimony that the two witnesses told him they had seen drug activity or that they knew the people coming and going to be involved with drugs. He did not testify at that hearing that he had previously received information from the two people and found it to be reliable. With respect to Blevins knowing the two people and that they reported a high volume of traffic, Blevins did not report any of that to the State Magistrate. He did not even report to the State Magistrate that the basis for his conducting surveillance was what he had been told by two unidentified persons.

During the 45 minutes he watched the White residence, Trooper Blevins "observed 7 or 8 vehicles come and go from the White residence." This supports his statement in the affidavit of "large amounts of traffic in and out of the residence."

There is no question that Trooper Blevins "later initiated a traffic stop on a vehicle which visited the residence[4] for defective equipment" and, during a search incident to the traffic stop, "drug contraband was found on the driver, ie: pipes, foil. ..." However, according to the Trooper's testimony during the <u>Franks</u> hearing, nothing else was found on the driver or in the driver's car. Inexplicably, Trooper Blevins intentionally averred to the State Magistrate that: "drug contraband was found on the driver, ie: pipes, foil, **etc.**" (emphasis added by the court). **"ETC"** implies to the State Magistrate that more than pipes and foil in the way of drug contraband was found on the driver. Trooper Blevins knew exactly what he had seized from the driver approximately an hour before he typed the affidavit and he well knew that there was nothing but the pipes and foil found and nothing to support his intentional "ETC" addition to the affidavit.

It is not true that the driver initially told Trooper Blevins "that he had smoked 'crank' earlier in the day." According to Trooper Blevins' written report, the driver "confessed to using drugs in the past. He stated he used to use meth but claimed he did not smoke any this date." Only when he "was further questioned did he admit to smoking "crank." Of course, the State Magistrate was not privy to the contents of Blevins' report, particularly since it had not yet been written.

Trooper Blevins testified during the <u>Franks</u> hearing that the driver changed his story about when he last smoked crank during the course of the station house interview that followed the traffic stop. Trooper Blevins testified the driver confessed he had smoked crank in the morning of the 28th

---

[4]Trooper Blevins withheld from the State Magistrate information he had garnered from Studer that Studer went to White's residence to see friends and a newborn baby and that people were in the house sitting and standing around talking.

and that was the basis for the inclusion in the affidavit. Trooper Blevins readily admits that he omitted telling the State Magistrate that he had been lied to by the driver twice: once with respect to having drug contraband on his person and later, with respect to when he smoked crank.

Trooper Blevins continues averring: "When questioned about the residence, he claimed that he did not buy drugs ... from the residence on this date".

With respect to all of the statements or "confessions" attributed to the driver by Trooper Blevins in his affidavit, the driver is not identified and there is no statement by Trooper Blevins which the State Magistrate could use to evaluate the credibility of the driver or the hearsay statements being attributed to him.[5] In addition, Trooper Blevins' own language, to wit: "he claimed" in the context of the other words of the sentence implies that even the state trooper had problems with the unidentified driver's veracity with respect to his not buying drugs from the residence. It is not known and the State Magistrate could not know whether Trooper Blevins' apparent problems with the driver's veracity stemmed from the fact that the driver lied to him about drug paraphernalia and use of crank. During Trooper Blevins' Franks hearing testimony, he stated that the driver (Studer) did not know that any drug activity was occurring at Defendant's residence. In Trooper Blevins' report, he wrote that the driver "claimed he did not know if there were any drug sales this date" again implying some lack of confidence in what the driver had told him.

The addition of the phrase "on this date" to the affidavit implied by misrepresentation to the State Magistrate that, while the driver claimed he did not buy drugs from the White residence on this date, he may have on other dates. This misrepresentation appears to have been intentional. According to Trooper Blevins' Franks testimony and written report, Blevins knew that the driver (Studer) denied buying any drugs or seeing any drugs purchased from Christine White or at her

---

[5]It was learned at the Franks hearing that the driver was "Studer".

residence. In addition, Trooper Blevins had no evidence or information from any other source to establish that the driver (Studer) had bought or seen drugs purchased from Christine White or at her residence.

Trooper Blevins further avers: the driver (unidentified to the State Magistrate) "confessed his friend did buy crack from the residence two days ago and stated he did observed [sic] the crack." It must be noted that the "friend" of the driver is also not identified to the State Magistrate. In fact, neither Studer or Blevins knew the last name or true identity of the person called "friend." Trooper Blevins provides the State Magistrate with nothing to use to judge the credibility of the hearsay statements the driver attributes to his "friend." Moreover, Trooper Blevins did nothing to verify the hearsay statements he was being provided by the driver. There is no evidence of prior dealings between the officer and the unidentified "friend" of the driver; no indication from the officer that he was familiar with the "friend" of the driver or the driver as a known drug suspect in the area; no indication that the officer had previously used the "friend" of the driver in a drug or prior criminal investigation; and no indication from the officer that others who had credibility with him (police officers or others he had worked with in the community) had specific knowledge concerning the driver or the driver's "friend." It appears that Studer must have told Trooper Blevins that his "friend's" first name was "Danny" because that name appears in Trooper Blevins' report which was never seen by the State Magistrate incident to the issuance of the search warrant.

Although the number of pills on the living room table may be disputed[6], the fact that some pills were on the living room table is not disputed. However, the presence of the pills on Defendant's living room table is a statement attributed by the officer to the unidentified driver. In

---

[6]The affidavit recites "4 or 5 loracets." Studer's Franks hearing testimony refers to a couple of white pills.

addition, the fact that pills may have been on the table and that they may have been loracet pills, is not indicative of drug dealing inasmuch as the driver denies seeing any dealing at the house.

The Fourth Circuit Court of Appeals reversed the District Court's refusal to suppress contraband drugs seized in a search of a home on the grounds that the affidavit in support of the search warrant issued by a State Magistrate was nothing more than bare bones, lacked probable cause and came as the result of the State Magistrate rubber stamping the police officers conclusions. United States v. Wilhelm, *supra*. The facts relied on in Wilhelm parallel the facts of White's case in many respects. In Wilhelm, Sheriff's Detective Proctor received a telephone call from an individual who said that he had observed marijuana in Wilhelm's home. Based on this call, Proctor prepared an affidavit in support of an application for a warrant to search Wilhelm's home stating therein:

> On 3-7-94 applicant received information from a reliable source who is a concerned citizen, a resident of Iredell County, a mature person with personal connections with the suspects and has projected a truthfull [sic] demeanor to this applicant. Informant stated to applicant the directions to this residence and the directions have been confirmed to be true by the applicant through surveillance on this date. The informant described the substance he/she believed to be marijuana and the informants [sic] description is consistent with the applicants [sic] knowledge of marijuana. Informant described transactions between residents and patrons that purchase marijuana at this residence and his/her descriptions of these actions are consistent with applicants [sic] knowledge of how marijuana is packaged and sold. Informant has personally observed residents selling marijuana at this residence within the last 48 hours. Informant also observed a quanity [sic] of un-sold marijuana at this residence within the last 48 hours.

No additional information was imparted to the State Magistrate. Detective Proctor admitted he did not know and had never met the informant prior to or after the telephone call.

Recognizing that "[a]n informant's tip is rarely adequate on its own to support a finding of

probable cause" and that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause" and the magistrate's "action cannot be a mere ratification of the bare conclusions of others" *Id.* 119, the appellate court criticized the magistrate judge stating: "[H]e found 'no internal inconsistencies in the affidavit itself which would lead a reader to question the informant's reliability' and he noted that 'a citizen-informer is presumptively reliable." *Id.* 120.

Relying on a long list of cases dealing with the corroboration of an informant's tip to establish probable cause[7] and recognizing that "somewhat less corroboration of an anonymous tip in the context of an investigatory stop might be required than in the case of a search warrant" (citing Terry v. Ohio, 392 U.S. 1 (1968)), the Wilhelm Court held: "The affidavit in this case did not adequately support the magistrate's finding of probable cause. It depended on information from an unnamed informant, and provided no indication of that informant's truthfulness or reliability. ... We conclude that this affidavit fell far short of providing probable cause for a search warrant. Upholding this warrant would ratify police use of an unknown, unproven informant- with little or no corroboration-to justify searching someone's home." United States v. Wilhelm, *supra* at 120.

To uphold the warrant in this case would be to ratify Trooper Blevins' use of unknown, unproven informant(s) (the two unidentified people, the unidentified driver, and, by hearsay, the

---

[7] United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993)(informant's tip reliable when police corroborated the suspect's address, vehicle, and alias, and **determined that he had been arrested for drug possession just a few days before the warrant was issued, confirming his involvement in drug activity**)(emphasis added by the Court); United States v. Miller, 925 F. 2d 695 (4th Cir. 1991)(warrant less search incident to search at a bus station upheld when officer, acting on tip of informant he did not know and had not used, recognized the name of the suspected drug courier as a person he had previously arrested for drug dealing, the informant identified a picture of the courier, officer observed courier in bus station prior to arrest and search and noticed that she was dressed and was carrying brown tote with shoulder strap as informant described) and United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990) upholding search warrant based on anonymous tip corroborated by previously reliable informant's purchase of crack cocaine from the suspect).

driver's totally unidentified "friend") with no corroboration. From a totality of the record at this point, including the testimony taken during the Franks hearing and Trooper Blevins' report (neither of which was before the State Magistrate), I cannot conclude there is substantial evidence in the record supporting the State Magistrate's probable cause determination. Massachusetts v. Upton, *supra.*

There is no evidence of record that the State Magistrate asked any questions of Trooper Blevins, a seven (7) year veteran of the West Virginia State Police Force. Trooper Blevins did not offer any explanation why he did not verify any of the information he was receiving from second and third hand sources he had not used before or why he did not check on the credibility of the driver or the driver's friend before seeking a search warrant based on information he received from the driver.

When the affidavit is stripped of its unsupported hearsay and information from unproven informants, what the State Magistrate would have had for her probable cause determination is:

> ON THIS DATE, THIS OFFICER WAS CONDUCTING SURVEILLANCE ON A RESIDENCE. THE U/S OBSERVED LARGE AMOUNTS OF TRAFFIC IN AND OUT OF THE RESIDENCE OVER APPROX 45 MINUTE TIME FRAME. THIS OFFICER LATER INITIATED A TRAFFIC STOP ON A VEHICLE WHICH VISITED THE RESIDENCE FOR DEFECTIVE EQUIP. DRUG CONTRABAND WAS FOUND ON THE DRIVER, IE: PIPES, FOIL . THE SUBJECT CONFESSED TO SMOKING "CRANK" EARLIER IN THE DAY.

Accordingly, I find that the information before the State Magistrate by way of Trooper Blevins' affidavit was insufficient upon which to find probable cause to search the residence of Christine White.

### B. Franks v. Delaware– Entitlement to Hearing

Even if the affidavit was sufficient for the State Magistrate to find probable cause for the issuance of the search warrant, Defendant argues that the search warrant was tainted because it was issued on false information, which includes omitted information.

"In Franks, the Supreme Court held that affidavits supporting search warrants are presumed to be valid and that a criminal Defendant may make a post hoc challenge to a facially sufficient affidavit only in very limited circumstances." United States v. Shorter, 328 F.3d 167, 170 (4th Cir. 2003) citing Franks v. Delaware, supra at 171-172.

"Where defendant makes substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in search warrant affidavit, and if allegedly false statement is necessary to the finding of probable cause, Fourth Amendment requires that a hearing be held at defendant's request." Franks v. Delaware, supra.

"The fact of an omission of material in a search warrant affidavit, standing alone, is not sufficient to demonstrate, at a *Franks* hearing, the affiant's intent to mislead or reckless disregard of whether the omission made the affidavit misleading." "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence of innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted. . . is only that of the affiant, not of any non-governmental informant." Id. at 171.

The Fourth Circuit has refined the test for a Franks hearing on the basis of omitted facts to require a two part showing:

A Defendant may obtain a hearing concerning the validity of an affidavit supporting

a search warrant by making "a substantial preliminary showing," *Franks*, 438 U.S. at 155, 98 S.Ct. 2674, that (1) the affiant omitted material facts "with the intent to make or in reckless disregard of whether [he] thereby made, the affidavit misleading." **Colkley, 899 F.2d at 300** (internal quotation marks omitted). This showing requires "a detailed offer of proof," *id.*, and "[a]llegations of negligence or innocent mistake are insufficient.," *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. The Defendant must also show that (2) the omitted material was "'necessary to the finding of probable cause,' "*ie.*, that the omitted material was such "**that its inclusion in the affidavit would defeat probable cause," Colkley, 899 F.2d 301** (quoting *Franks*, 438 U.S. at 156, 98 S.Ct. 2674). Upon making this two-part preliminary showing, a Defendant is entitled to a hearing, at which he bears the burden of proving the allegations by a preponderance of the evidence. *See Franks*, 438 U.S. at 156, 98 S.Ct. 2674.

In <u>United States v. Colkley</u>, 899 F.2d 297, 300 (4th Cir. 1990) the Court held: "[t]he rule requires that a dual showing be made which incorporates both a subjective and an objective threshold component. In order even to obtain an evidentiary hearing on the affidavit's integrity, a Defendant must first make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.' This showing 'must be more than conclusory' and must be accompanied by a detailed offer of proof. In addition, the false information must be essential to the probable cause determination: 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.' The *Franks* test also applies when affiants omit material facts 'with the intent to make, or in reckless disregard of whether they thereby made the affidavit misleading.'" (internal citations omitted).

Defendant's motion meets the mandate of <u>Franks,</u> inasmuch as the motion specifies that the West Virginia State Police report prepared by Trooper Blevins contradicts the same officer's affidavit in support of the search warrant, and shows that the affidavit contained misrepresentations and omissions. Defendant also argues that the misrepresentations and/or omissions were material

and that they were either made deliberately or with reckless disregard for the truth. Inasmuch as Trooper Blevins conducted the interview of the witness he had detained and wrote the affidavit in support of the warrant, the alleged omissions and misrepresentations that are apparent on the face of the application for the warrant meet the threshold test of being either intentionally made or made with reckless disregard for their truth. It takes a hearing to decide which. The United States' terse response sheds no light on this threshold analysis.

## C. <u>Franks</u> Hearing

During the <u>Franks</u> hearing, the Court received the report of Trooper Blevins, a copy of the affidavit in support of the search warrant issued by the State Magistrate, the testimony of Trooper Blevins and the testimony of Studer. An analysis of the same is in order relative to Defendant's contention that Trooper Blevins' affidavit contains material misrepresentations and omissions.

**i.      Information Available To Trooper Blevins When Search Warrant Affidavit Prepared**

**a.      Trooper Blevins' Investigation Report**

In his Report of the incident written after the affidavit, Trooper Blevins states as follows:

On February 28, 2006[8], this officer received information from a *confidential informant* pertaining to possible drug trafficking out of the Christine White residence. The informant stated that the informant had observed a large amount of traffic in and out of the residence throughout the day. The informant stated the informant would periodically observe high amounts of traffic in and out of the residence. The informant stated the amount of traffic was especially high this date. This officer was familiar with the location of the residence , which was resided by Christine White. The residence is located on Old Route 33 West across from Aggregates rock quarry.

_____

[8]

Trooper Blevins admitted the date of February 28, 2006 was wrong and that his report should have read "November 28, 2006." When asked if he made the mistake in the date because he was actually preparing the report in February 2007, Trooper Blevins advised the Court that he prepared the report within weeks to a month of the November 28, 2006 stop and resultant search and had no reason for the erroneous February date.

The residence is a single wide blue trailer on the northern side of Old Route 33 West.

At approximately 2000 hours, this officer conducted visual surveillance of the White residence from a nearby parking lot. During the approximate forty five minute - one hour span, this officer observed approximately 7-8 vehicles travel into the driveway, stay for approximately 5-10 minutes and leave. This officer followed behind one of the vehicles leaving the White residence onto Harrison Avenue. This officer observed that the vehicle did not use his turn signal when turning onto the side road and requested his driver and vehicle information. This officer inquired if he had any illegal contraband on his person or in his vehicle. *He advised he did not.* The subject consented to a search of both. Upon patting down the subject, *this officer located foil and homemade "pipes" in his pocket.* This officer inquired about the items. He confessed to using drugs in the past. He stated he *used to use meth, but claimed he did not smoke any this date.* This officer inquired if there was any drug activity taking place in the residence he had just left. He stated that he had just left Christine White's residence. He stated he did see Lorasets [sic] on the coffee table while he was there. He advised there were also other people in and out of the residence that he did not know. He claimed *he did not know if there were any drug sales this date,* but *his friend, Danny, had just bought crack off of Christine White two days ago, from her residence.* He stated he did see the crack. He stated he did not know Danny's last name.

### b.    Information As Remembered By Lindsey J. Studer

The Court heard the testimony of Lindsey J. Studer, the "driver" who was questioned by Trooper Blevins on November 28, 2006, after leaving Defendant's residence. Studer testified that in late November 2006, he was stopped by Trooper Blevins on Central Street, Elkins, West Virginia. He had been stopped for not signaling a turn. He was alone in his vehicle. He had just come from Defendant's trailer. Trooper Blevins asked Studer why he was at Defendant's residence. Studer told the officer that friends from out of town had called him and said they were at Defendant's residence with their newborn baby, so he went there to visit them.

Trooper Blevins asked Studer to get out of the car and searched him, finding a "tooter"[9] and foil on him. Studer testified *he had been smoking "crank" earlier that morning,* and used the foil

---

[9]Studer explained that a "tooter" is a home made pipe made, in this case, from a piece of a pen, used to smoke drugs.

and tooter for that purpose. Trooper Blevins then took Studer to the State Police office and questioned him further. Trooper Blevins asked Studer if he had seen any drug activity, exchange or use at Defendant's residence, and *Studer replied that he had not.* The only thing he saw were *"a couple pills on the table."* He went there only *to see his friends and their newborn baby.* The trooper asked him why he had the tooter and foil, and Studer said he had used them that morning.

Studer then told Trooper Blevins that he had a friend, "Danny," whom he saw light up a piece of glass tubing earlier that morning. He asked Danny, "What was that?" to which *Danny replied it was crack that he had gotten "from Christine."* Studer testified *he did not tell Trooper Blevins when Danny got the crack*, and that *Danny did not tell him when he got the crack.* Studer also told Trooper Blevins *he did not see Danny get the crack from Christine*, and, in fact, that *"Danny's" statement to him was just "hearsay."*

Studer told Trooper Blevins that the he saw three people he knew at Defendant's residence, plus the baby, as well as two other men and a woman he did not know. Another person, Chris Lotus [sp] came in and talked to Defendant for a few minutes, and then left. Studer did not know what they talked about. Studer said he was at Defendant's residence for about 15-20 minutes. During that time no one else came or went. The other people were just sitting and talking.

Studer testified that *he never saw any kind of drug distribution at Defendant's residence*, and *told Trooper Blevins that he did not. He had known Defendant for several years and had never seen her distribute any kind of paraphernalia, drugs or "whatever."* He was present when "Danny" smoked the crack, at about 7 a.m. that same day. *He did not know when Danny got the crack*, and *did not personally know that he got the crack from Defendant.* He did not tell Trooper Blevins that Danny got the crack from Defendant, only that Danny said he did. *He did not tell Tpr. Blevins that Danny got the crack two days earlier. He did not know when Danny got the crack* and did not

personally know where he got it. Studer testified he had smoked crank early that morning before he saw Danny. Studer testified that Danny's smoking of crack was *not done at Christine White's residence*. Studer did not indicate that he had smoked the crank at Christine White's residence.

### c. Information As Remembered By Trooper Blevins

The Court next heard the testimony of West Virginia State Trooper Chris Blevins. Trooper Blevins swore out the affidavit in support of the search warrant on November 28, 2006. He testified he had received calls from two people who were concerned that the large volume of traffic in and out of Defendants residence was indicative of possible drug activity. Trooper Blevins testified that the two people were close to him; were people he had known for years; that they had no criminal records and had no reason to lie about the matter. The two people told Trooper Blevins that they had observed large numbers of vehicles coming into and out of Defendant's residence. On November 28, 2006, there was an especially high volume of traffic at Defendant's residence.

Trooper Blevins took an unmarked police vehicle and went to a parking lot near Defendant's residence. He monitored Defendant's residence for about ½ hour to 45 minutes, observing about seven to eight vehicles go in and out during that time. Each vehicle stayed about five to ten minutes then left. Trooper Blevins observed one vehicle pull out. He followed that vehicle to see what the occupants were doing. The driver did not use his turn signal when turning into a side street. When the vehicle stopped, Trooper Blevins pulled in behind him. Trooper Blevins exited his vehicle and told the driver – Studer– that he had stopped him for failure to signal a turn. He recognized Studer as he had had dealings with him before, including having arrested him.

Trooper Blevins asked Studer where he was coming from, to which Studer responded that he was coming from Defendant's residence. He said he had gone to Defendant's residence to see his friends and their new baby. Studer told Trooper Blevins he had "nothing on him." The trooper

performed a "Terry" search, finding foil and "pipes" in Studer's shirt pocket. The trooper recognized the items as commonly used when smoking methamphetamine. Studer confessed to Trooper Blevins that he had a drug problem. He used meth. Initially, Studer told him he had not done any meth in the past few days, but later admitted he had smoked meth earlier that morning. The foil was not used, but was left over. Trooper Blevins asked if Studer would come to the police office to talk and Studer said he would.

Studer told Trooper Blevins he had seen a few people at Defendant's residence that he knew, and a few that he did not know. He had gone there to see friends and their newborn baby. One individual came into the residence while he was there, spoke with Defendant a few minutes, and then left. He did not know that any drug activity was occurring at Defendant's residence. He did see some Loracets on a table.

Studer told Trooper Blevins that he saw his friend Danny smoking crack a few days earlier. Trooper Blevins asked Studer where Danny got the crack. Studer told Blevins that Danny said he got it from White's house.

The interview with Studer was not recorded and there was no written statement taken. Trooper Blevins testified he did the report weeks to a month after the incident in question, and the report was based on his memory of the events.

Trooper Blevins conceded that the report said Studer had not smoked crank that day, while the affidavit for the search warrant said that he had. The trooper admitted these two statements were inconsistent. The trooper attempted to explain the inconsistency by testifying that Studer had initially said he had not smoked crank that day, but later changed his story and said he had smoked crank earlier that day. Inexplicably, the trooper did not share this change of story with the state magistrate.

Trooper Blevins testified that Studer had lied to him twice during the questioning– once when

he said he had "nothing on him" and once when he said he had not smoked crank that day. However, he felt Studer was being completely truthful in the end. Trooper Blevins agreed that he could have shared with the state magistrate the reasons why he believed the two people who had initiated the investigation by their complaints of high volume traffic in and out of White's residence and that Studer had lied to him. However, he did not share this information. He acknowledged that there was nothing in Studer's statement regarding Danny getting crack two days ago. Instead, "two days ago" referred to when Studer saw Danny smoke crack. He had no knowledge when Danny got the crack.

Trooper Blevins met with Magistrate Good approximately one hour after questioning Studer. He himself typed the affidavit at his office. He may have jotted down a few notes during his interview of Studer, but did not believe he still had them. He believed the affidavit was accurate, because he had written it directly after interviewing Studer. His report, on the other hand, was prepared in the following weeks to one month.

Based on the testimonies, report and search warrant affidavit, the significant **consistencies**, *inconsistencies* and *omissions* between what was contained in the affidavit in support of the issuance of the search warrant and what was stated in the later prepared report and what was actually known by Blevins based on his in court testimony and what Studer testified he remembered telling Blevins are:

| Affidavit | Report | Blevins' Testimony | Studer's Testimony |
|---|---|---|---|
| Drug Contraband was found on the driver, ie pipes foil *etc.* | This officer located foil and homemade pipes in his pocket. | *Studer lied saying he had nothing on him.* | Blevins asked him to get out of the car and searched him, finding a "tooter" and foil on him. |

| | | | |
|---|---|---|---|
| Confessed to smoking crank earlier in the day. | Confessed to using drugs in the past. He stated he used to use meth but claimed he did not smoke any this date. | _Studer lied saying he had not done any meth in past few days and then later admitted using meth that morning._ | Admitted smoking crank that morning. |
| He claimed he did not buy drugs from the residence on this date. | He claimed he did not know if there were any drug sales this date. | He did not know that any drug activity was occurring at Defendant's residence. | He had not seen any drug use or exchange at Defendant's house. He had never seen any kind of drug distribution at Defendant's house. He had known Defendant for several years and had never seen her distribute any kind of paraphernalia, drugs or whatever. |
| Confessed his fried did buy crack from the residence two days ago and stated he did observe the crack. | But his friend Danny had just bought crack off Christine White two days ago from her residence. He stated he did see the crack | He saw his friend Danny smoking crack a few days earlier. Danny said he got it from White's house. | He saw Danny light up crack earlier that morning that he had gotten from Christine. Studer did not know when Danny got the crack and did not see Danny get the crack. He (Studer) did not tell Blevins that Danny got the crack two days earlier and he did not tell Blevins that Danny got crack from Defendant. He only said that Danny said he got it from Defendant. |
| | | _Blevins knew reason Studer was at Defendant's house was to see a newborn baby._ | _He was at Defendant's house to see friends and a newborn baby._ |

For purposes of the <u>Franks</u> analysis and based on a totality of the circumstances (<u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983) and <u>United States v. Gillenwaters</u>, 890 F.2d 679, 682 (4th Cir. 1989), I conclude the following facts by a preponderance of the evidence standard:

1) The following information was omitted from the affidavit in support of a search warrant by Trooper Blevins with reckless disregard for the truth:

   a. Studer lied saying he had nothing in the way of contraband on him when he did.

   b. Studer lied saying he had not done any meth in past few days only to later in the same interview admit to using meth that morning.

   c. The reason Studer was at Christine White's residence on November 28, 2006 was to see friends and a new born baby.

2) The omission that Studer lied from the affidavit precluded the State Magistrate from evaluating the credibility of the substantial hearsay and double hearsay information Trooper Blevins was providing in the affidavit that came from or through Studer and which would have been the primary basis for the probable cause determination. Without the substantial hearsay and double hearsay information Trooper Blevins was providing in the affidavit that came from or through Studer, the State Magistrate would have only had the events Trooper Blevins actually witnessed. As previously pointed out, that information was insufficient on which to base a probable cause determination.

3) The omission of Studer's explanation for his visit to White's residence from the affidavit is not in itself destructive of probable cause. However, its absence coupled with the absence of the misrepresentations that were included had the designed or desired effect of misleading the State Magistrate with respect to the true state of facts as known by Trooper Blevins as opposed to the slanted version he actually presented.

4) The following misrepresentations were included in the affidavit with intent to mislead the State Magistrate:

   a.   "ETC" with respect to the fact that "Drug contraband was found on the driver, ie." when the only contraband found was "pipes, foil." This could only be intended to lead the State Magistrate that this driver who had been stopped just after leaving Defendant's house had something more on him than the pipes and foil.

   b.   The addition of "on this date" to the sentence "he claimed that he did not buy drugs" from the residence of Christine White could only be for the intended purpose of misleading the State Magistrate to conclude that the driver had bought drugs from White on other dates. Trooper Blevins knew that Studer had told him that he did not know of any drug activity occurring at Defendant's residence.

Based on the foregoing analysis, I conclude that omissions and misrepresentations were made by Trooper Blevins in his affidavit to the State Magistrate "with the intent to make, or in reckless disregard of whether they thereby made the affidavit misleading" thereby seriously undermining the integrity of the affidavit and any probable cause determination made thereon. <u>United States v. Colkley</u>, 899 F.2d 297, 300 (4th Cir. 1990). "The affidavit in this case did not adequately support the magistrate's finding of probable cause" because it depended on information from unnamed informants and provided no indication of the unknown informant's truthfulness or reliability. <u>United States v. Wilhelm</u>, *supra* at 120.

### C. The Good Faith Exception to the Exclusionary Rule (Leon)

Should the District Court find that the affidavit is insufficient, even under the totality of the circumstances, to support a probable cause determination, the evidence obtained in the execution of the warrant may still be saved from suppression under the "good faith" exception to the exclusionary

rule announced in United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). In Leon, the Supreme Court recognized "a good-faith exception to searches conducted pursuant to warrants." Id. at 924, 104 S. Ct. 3405, 3421. The exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). In Leon, the Supreme Court explained the reason for rule. "First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." 468 U.S. 897, 915, 104 S. Ct. 3405, 3417.

"If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Id. at 918, 104 S. Ct. 3405, 3419. The Supreme Court concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id. at 922, 104 S. Ct. 3405, 3420. Therefore, the question of whether the good faith exception to the exclusionary rule should be applied to suppress evidence, depends on whether suppression of the evidence would have the desired effect of deterring police misconduct. In most cases, "when an officer acting with objective good faith has obtained a search warrant from a judge

or magistrate and acted within its scope . . . . there is no police illegality and thus nothing to deter."
<u>Id.</u> at 920-21, 104 S. Ct. 3405, 3419.

The Fourth Circuit followed the Supreme Court's line of reasoning in <u>United States v.
Hyppolite</u>, 65 F.3d 1151 (4th Cir. 1995). In <u>Hyppolite</u>, the defendant moved to suppress evidence that
was obtained pursuant to a search warrant. In issuing the search warrant, the State Magistrate had
relied in part on factors such as Hyppolite's refusal to answer officers' questions and his refusal to
consent to a warrantless search, as well as the manner of his refusals. <u>See id.</u> at 1155. The district
court found that no probable cause existed for the search warrant before the officers encountered
Hyppolyte. Hyppolyte argued that the assertion of his constitutional rights and the manner in which
he asserted them should not support a finding of probable cause. <u>Id.</u> The district court did not reach
the question of whether the form in which a suspect asserted his rights could be part of the
determination of probable cause. Instead, the district court concluded that the evidence seized
pursuant to the warrant should be admitted under the good faith exception to the exclusionary rule.
<u>Id.</u>

The Fourth Circuit held that "an objectively reasonable officer should have known that the
mere assertion of constitutional rights cannot establish probable cause." <u>Id.</u> at 1157. However, the
Court found the question of whether the <u>form</u> of the assertion of constitutional rights could be
considered was less settled. Therefore, because the law was not clear whether such factors should
have been considered by the magistrate when the officers sought the warrant, the Court concluded that,
"an objectively reasonable officer could have relied on the magistrate's determination of probable
cause in this case." <u>Id.</u> "Because the officers reasonably could have relied on the magistrate's
determination that the manner in which Hyppolite asserted his rights could support a finding of
probable cause," the Court affirmed the district court's denial of Hyppolite's motion to suppress. <u>Id.</u>

Therefore, the question in the present case is whether Trooper Blevins reasonably relied on the magistrate's determination that there was probable cause for the search.

"The good faith exception does not apply in four situations: first, when the warrant is based on an affidavit containing 'knowing or reckless falsity'; Second, when the magistrate has simply acted as a 'rubber stamp' for the police; third, when the affidavit does not 'provide the magistrate with a substantial basis for determining the existence of probable cause'; and finally, when the warrant is so 'facially deficient' that an officer could not reasonable rely on it." United States v. Wilhelm, *supra* at 121 (internal citations omitted).

In accord with earlier findings, I conclude that the good-faith exception should not apply in this case because of the bare-bones nature of Trooper Blevins' affidavit. Based on the affidavit, no "detached and neutral magistrate" could have issued a search warrant on Trooper Blevins' hearsay ridden uncorroborated affidavit but for him or her acting as a rubber stamp. United States v. Wilhelm, *supra* at 121. Trooper Blevins, an educated and trained West Virginia State Trooper with seven years of experience, had to have known that Studer's friend Danny (last name unknown) was unavailable and could not be demonstrated to be reliable. Moreover, Trooper Blevins made no effort to substantiate that Danny got drugs from Christine White or her residence at any time prior to November 28, 2006. Trooper Blevins did not do anything to establish the reliability or bona fides of Studer. Instead, he presented bits and pieces of what he learned from Studer to the State Magistrate in such a way that the State Magistrate did not question the information or the source of the information and such that there was no neutral determination of probable cause. Trooper Blevins could not rely on an unknown, unavailable informant without significant corroboration.

If the uncorroborated information from Studer purportedly about and from his friend Danny,

to wit: "But confessed his friend did buy crack from the residence two days ago"[10]what is left, even if not defective for other reasons pointed out herein, does not establish probable cause to believe that drug dealing was going on in Defendant's house or that illegal drugs were present in Defendant's house. While it is true that loracets may have been seen on the table (whether 4 or 5 or only a couple), that statement is not indicative of unlawful conduct.[11]

As in Wilhelm, *supra* at 123, I cannot conclude with any certainty that Trooper Blevins omissions and misrepresentations were "undertaken with deliberate bad faith." However, his use of "suspected drug dealer", "etc.", "claimed", "on this date" and "confessed his friend did buy crack from the residence two days ago and stated he did observed [sic] the crack", strikes me "as attempts to endue the affidavit with the appearance of genuine substance" and "this tactic suggests that [Blevins himself] knew that probable cause was lacking, and thus that reliance on the resulting warrant was not reasonable." Wilhelm, *supra* at 123.

Accordingly, I conclude that the search warrant which is not supported by probable cause is not saved by the Leon good faith exception.

## **RECOMMENDATION**

For the reasons set forth herein in the body of this Opinion/Report and Recommendation, I **RECOMMEND** that Defendant's "Motion to Suppress Evidence" filed on March 23, 2007 [Docket Entry 16] and "Motion to Suppress Evidence Pursuant to Franks v. Delaware" filed on March 29, 2007

---

[10]It must be again noted that Studer told Trooper Blevins that "Danny" told him he bought the crack from the residence. Neither Studer or Danny were before the State Magistrate who issued the search warrant. Trooper Blevins did not tell the State Magistrate that this information came to the affidavit by way of double hearsay and that he (Blevins) had corroborated none of it.

[11]Loracets may be a legal prescription or they may be the subject of unlawful distribution. However, from the affidavit there is no way for the State Magistrate to determine which. All the State Magistrate could reasonably conclude was the presence of the pills.

[Docket Entry 19] be **GRANTED** and that the evidence seized as a result of the search of Christine White's residence pursuant to the search warrant issued by State Magistrate Good on November 28, 2006 be **SUPPRESSED.**

Any party may, within ten (10) days after being served with a copy of this Opinion/Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Opinion/Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Opinion/Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Opinion/Report and Recommendation to counsel of record.

Respectfully submitted this 4th day of May, 2007.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE